UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
EBONY ARMSTEAD,

                              Plaintiff,                      17-cv-1163 (PKC)

        -against-                                             MEMORANDUM
                                                              AND ORDER

STARBUCKS CORPORATION,

                              Defendant.
------------------------------------------------------------x

CASTEL, U.S.D.J.

        Plaintiff Ebony Armstead alleges that defendant Starbucks Corporation

("Starbucks") had a policy of "time shaving" employee hours, in violation of the Fair Labor

Standards Act, 29 U.S.C. § 201, et seq. ("FLSA"), and the New York Labor Law ("NYLL").

According to Armstead, while employed by Starbucks as a barista, she was required to clock out

at a fixed time but to continue working without compensation.  She alleges that Starbucks

required her to work approximately 9.5 uncompensated hours each week.

        Starbucks moves to stay proceedings and compel arbitration.  According to

Starbucks, during the hiring process, Armstead electronically signed an arbitration agreement

(the "Arbitration Agreement") that requires her claims to be decided by an arbitrator.  Starbucks

moves to compel arbitration and stay proceedings pursuant to the Federal Arbitration Act

("FAA"), 9 U.S.C. § 1, et seq.  It also seeks to dismiss Armstead's allegations in support of a

collective or class action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), Fed. R.

Civ. P.

For the reasons that will be explained, the motion to compel arbitration and stay this proceeding is granted.  The motion to dismiss plaintiffs' allegations related to her putative class action and collective action claims is denied without prejudice.

BACKGROUND.

    A.  <u>Armstead's Claims.</u>

Armstead alleges that in or about May 2015, Starbucks hired her to work as a barista at its branch on Waverly Place and Sixth Avenue in Greenwich Village.  (Amended Complaint (the "Complaint") ¶ 22.)  She occasionally was assigned to shifts at other Starbucks locations in the nearby Chelsea neighborhood.  (Compl't ¶ 23.)

According to Armstead, she worked from approximately 4 p.m. to 2 a.m. five days a week, and from 4 p.m. until 12:30 a.m. two days per week.  (Compl't ¶ 24.)  Armstead asserts that management required employees to clock out of work at 11:30 p.m., but to continue working off the clock until the shift ended.  (Compl't ¶ 25.)  Armstead alleges that she worked approximately 9.5 uncompensated hours every work week, and that Starbucks failed to pay overtime for hours worked in excess of 40 per week.  (Compl't ¶¶ 25-26.)  The Complaint includes allegations in support of collective action certification under the FLSA and class action certification for Armstead's NYLL claims.  (Agrm't ¶¶ 11-21.)

    B.  <u>The Starbucks Arbitration Agreement.</u>

Starbucks moves to compel arbitration, stay this action, and dismiss Armstead's allegations in support of a class action and collective action.  (Docket # 27.)  Starbucks annexes a copy of the Arbitration Agreement that it contends governs Armstead's claims.  (Kennedy Dec. Ex. G.)  The Agreement states in part:

> <u>Mutual Agreement to Arbitrate.</u>  Starbucks and I agree to use binding individual arbitration to resolve any "Covered Claims" that

- 2 -

arise between me and Starbucks, its subsidiaries and related companies . . . .  "Covered Claims" are those brought under any statute, local ordinance, or common law relating to my employment, including those concerning any element of compensation, harassment, discrimination, retaliation, recovery of bonus or relocation benefits, leaves of absence, accommodations, or termination of employment.

**Except as provided herein, I understand and agree that arbitration is the only forum for resolving Covered claims, and that both Starbucks and I waive the right to a trial before a judge or jury in federal or state court.** . . .

Except as provided below, Starbucks and I agree that the Arbitrator – and not a court or agency – shall have exclusive authority to resolve any dispute regarding the formation, interpretation, applicability, enforceability, or implementation of this Agreement, including any claim that all or part of this Agreement is void or voidable.

(Kennedy Dec. Ex. G; emphasis in original.)

The Agreement also waives a plaintiff's ability to bring claims in a class or collective action.  (Kennedy Dec. Ex. G.)  It excludes certain categories of claims from arbitration, including those involving workers' compensation or unemployment benefits, charges with the Equal Employment Opportunity Commission and similar agencies, or actions to enforce or vacate an arbitration award.  (Kennedy Dec. Ex. G.)  It also sets forth procedures to be used during arbitration and for the selection of an arbitrator.  (Kennedy Dec. Ex. G.)

LEGAL STANDARD.

"Under the [FAA] '[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable.'"  Meyer v. Uber Techs., Inc., 868 F.3d 66, 73 (2d Cir. 2017) (quoting 9 U.S.C. § 2).  "[P]arties can petition the district court for an order directing that 'arbitration proceed in the manner provided for in such agreement.'"  Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229

- 3 -

(2d Cir. 2016) (quoting 9 U.S.C. § 4).  "The district court must stay proceedings once it is 'satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding.'"  Nicosia, 834 F.3d at 229 (citing WorldCrisa Corp. v. Armstrong, 129 F.3d 71, 74 (2d Cir. 1997)).

"[B]efore an agreement to arbitrate can be enforced, the district court must first determine whether such agreement exists between the parties.  This question is determined by state contract law."  Meyer, 868 F.3d at 73-74 (citing Nicosia, 834 F.3d at 229; see also PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1198 (2d Cir. 1996) ("in interpreting an arbitration agreement we apply the principles of state law that govern the formation of ordinary contracts.").

Courts decide motions to compel arbitration using a standard "similar to that applicable for a motion for summary judgment."  Meyer, 868 F.3d at 74 (quotation marks omitted).  Courts consider "all relevant, admissible evidence submitted by the parties and contained in 'pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits.'"  Id. (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002)).  Every reasonable inference is drawn in favor of the non-moving party.  Id.  If factual issues exist concerning the formation of an arbitration agreement, a trial on the issue is required.  Id.

DISCUSSION.

A.  The Motion to Compel Arbitration Is Granted.

1.  Law Governing the Online Formation of an Arbitration Agreement.

Armstead asserts that she did not agree to arbitrate her claims against Starbucks. According to Armstead, the Agreement was "hidden" and "buried" by Starbucks as part of a complicated, multi-step application process that was misleadingly presented as a mere formality.

"'[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he [or she] has not agreed so to submit.'" Adams v. Metro. Transp. Auth., 153 A.D.3d 515, 516 (2d Dep't 2017) (alteration in original; quoting Matter of Monarch Consulting, Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA, 26 N.Y.3d 659, 674 (2016)). "A party may not be compelled to arbitrate a dispute unless there is evidence affirmatively establishing that the parties clearly, explicitly, and unequivocally agreed to arbitrate." Adams, 153 A.D.3d at 516-17. As with any contract, "[t]o establish the existence of an enforceable agreement, a [party] must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound. That meeting of the minds must include agreement on all essential terms." Kowalchuk v. Stroup, 61 A.D.3d 118, 121 (1st Dep't 2009).

"The creation of online contracts 'has not fundamentally changed the principles of contract.'" Resorb Networks, Inc. v. YouNow.com, 30 N.Y.S.3d 506, 510 (N.Y. Sup. Ct. N.Y. Cnty. 2016) (quoting Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 403 (2d Cir. 2004)). "Where the supposed assent to terms is mostly passive, as it usually is online, courts seek to know 'whether a reasonably prudent offeree would be on notice of the term at issue', and whether the terms of the agreement were 'reasonably communicated' to the user." Id. (quoting Schnabel v. Trilegiant Corp., 697 F.3d 110, 120 (2d Cir. 2012)). Surveying the federal courts' interpretation of New York law, Resorb identified "three general principles" guiding the enforceability of online agreements: first, the website must place a "reasonably prudent user" on "inquiry notice" of the agreement's terms; second, "the design and content of the website must encourage the user to examine the terms clearly available through hyperlinkage"; and third, agreements will not be enforced "where the link to the agreement is buried at the bottom of a

webpage or tucked away in obscure corners of the website." Id. at 511 (quotation marks omitted).

In Meyer, which was decided while briefing for this motion was in progress, the Second Circuit provided detailed guidance as to the online formation of an arbitration agreement. Meyer concluded that a party has typically consented to arbitration when she agrees to a "clickwrap" or "click-through" agreement.[1] 868 F.3d at 75.  In such agreements, the user clicks "an 'I agree' box" after being presented with a list of terms and conditions of use . . . ." Id. Alternatively, a party may be bound by a web-based contract if she is placed on inquiry notice, meaning that "the notice of the arbitration provision was reasonably conspicuous and manifestation of assent unambiguous as a matter of law." Id. at 76.

2.  Armstead's Hiring Process.

Armstead has submitted a sworn affidavit on her own behalf, and Starbucks has submitted the Declaration of Matthew Kennedy, who has the job title of Director, Talent Acquisition at Starbucks.  (Docket # 33, 29.)  Both Armstead and Kennedy have described a three-step process for Armstead's hiring.  First, Armstead completed a preliminary online application.  (Kennedy Dec. ¶¶ 5-6; Armstead Aff't ¶¶ 3, 5-7.)  Second, she was interviewed at a Starbucks branch, and subsequently received an offer.  (Armstead Aff't ¶ 3; Kennedy Dec. ¶ 10.) Third, she completed what Kennedy calls the "Employee Onboarding" process, wherein Armstead completed an in-store, electronic application, with guidance from a Starbucks manager.  (Kennedy Dec. ¶ 10; Armstead Aff't ¶ 3, 9-17.)  In this third step, Armstead

---

[1] Meyer applied California law, but "note[d] that New York and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term." Id. at 74 (quotation marks omitted).

electronically signified that she agreed to the Arbitration Agreement.  Armstead asserts that she did not knowingly consent to the Arbitration Agreement.  (Armstead Aff't ¶ 17.)

On step one, Armstead submitted her initial, online application on April 13, 2015. (Kennedy Dec. ¶ 6 & Ex. C.)  Under the heading "Pre-Application Disclosures," Starbucks stated that it had a company policy that "all new hires shall be subject to an arbitration agreement as a condition of employment."  (Kennedy Dec. ¶ 7 & Ex. B.)  This initial application did not include a hyperlink to the arbitration agreement or describe its terms, nor did it require Armstead to expressly agree to arbitration.  (Kennedy Dec. Ex. B.)  Armstead states, "I never saw any mention of arbitration in the online application I filled out on April 13, 2015, either because it was not there, or because Starbucks used the design of the screen to conceal it from me, just as it is hidden in the current online application version."  (Armstead Aff't ¶ 7.)  The Court concludes that the passing reference to arbitration in the initial application did not bind Armstead to any arbitration provision or provide meaningful notice of the Arbitration Agreement.  See Meyer, 868 F.3d at 75 (online references to arbitration "that do not solicit an explicit manifestation of assent" are typically non-binding) (quotation marks omitted).

On the second step of her hiring, a Starbucks manager interviewed Armstead on May 7, 2015, and she received an offer of employment shortly thereafter.  (Kennedy Dec. ¶ 10.)

As the final step in her hiring process, on May 18, 2015, Armstead completed what Kennedy calls the "Employee Onboarding" procedure.  (Kennedy Dec. ¶ 10.)  At that point, Armstead was required to electronically re-submit personal information and consent to certain employment terms set by Starbucks.  (Kennedy Dec. ¶ 10-19.)  Armstead states this process took place at a Starbucks branch, where a manager guided her through the step-by-step submission of electronic information.  (Armstead Aff't ¶ 8.)  According to Armstead, the manager told her that

the process "was just a formality" and a "standard procedure" intended "to resubmit and confirm information I had already submitted."  (Armstead Aff't ¶¶ 9, 13.)

As described by Kennedy, Armstead was required to consent to receive and respond to information in electronic form, and to agree "to use the electronic click as my 'written' signature" prior to clicking on assorted forms.  (Kennedy Dec. ¶¶ 13-14 & Ex. E.)  The "e-Signature Acceptance" page required Armstead to agree as follows: "I intend both the signature I inscribe with the 'click' signature technology and the electronic record of it to be my legal signature to the document."  (Kennedy Dec. Ex. E.)  Armstead states that the in-store manager told her that an electronic signature was required in order to confirm that she truthfully submitted information.  (Armstead Aff't ¶ 10.)

Armstead states, "While filling out the in-store application, I was never informed in any way, by either the manager going through the application with me step-by-step, or the application itself, about any agreement to arbitration."  (Armstead Aff't ¶ 12.)  She states, "I do not remember seeing or clicking anything regarding an arbitration agreement.  The only reason for which I provided my e-signature was to verify that the information and documents I was providing to Starbucks were true and accurate."  (Armstead Aff't ¶ 15.)  Armstead also states:

> If I did provide an e-signature relating to a purported agreement to arbitrate, I only did so because Starbucks mislead me into doing so, by presenting the agreement to [sic] as one of several documents that I had already prepared and submitted.  I believe Starbucks deliberately tricked me into providing my e-signature for a hidden arbitration clause on the in-store application, by inserting the signature box under instructions that I was signing for purposes unrelated to arbitration.  The Starbucks manager who oversaw my application process told repeatedly me while I was filling out my in-store application that the electronic signature was for purposes unrelated to arbitration.  The manager never mentioned arbitration to me at that stage or any other.

(Armstead Aff't ¶ 16.)

As described in the Kennedy Declaration, once Armstead agreed to use an electronic signature, she was required to click on various forms.  (Kennedy Dec. ¶¶ 13-14.)  The "e-Signs Forms" page stated in part, "The following forms require your electronic signature . . . . You must read each form before signing it.  . . .  You sign each form by clicking the 'Sign' link associated with that form.  . . .  Throughout these web pages on electronic signature you may click on view links that are underlined and an Adobe PDF file version of a document or form will open for your review."  (Kennedy Dec. F.)  Below that text, three identified documents are clearly and distinctly presented, and labeled, "W-4", "I-9" and "Arbitration Agreement." (Kennedy Dec. Ex. F.)  Each document is presented with a hyperlink labeled "View," and next to the I-9 and Arbitration Agreement, parenthetical text states, "(view required before signing)". (Kennedy Dec. Ex. F.)

Kennedy states that Armstead could not have electronically signed the Arbitration Agreement without first clicking a "View" button that opened a copy of the agreement. (Kennedy Dec. ¶ 15.)  He states that according to Starbucks records, Armstead electronically signed the Arbitration Agreement at 9:43 a.m. on May 18, 2015.  (Kennedy Dec. ¶ 17 & Ex. H.) Kennedy also states that after Armstead signed the Arbitration Agreement, an automatically generated e-mail was sent to Armstead's e-mail address, attaching a copy of the Arbitration Agreement.  (Kennedy Dec. ¶ 17 & Ex. H.)

Starbucks also has come forward with evidence that Armstead received a copy of the Arbitration Agreement via e-mail.  Exhibit H to the Kennedy Declaration includes a screenshot of Starbucks records titled "Email History," which lists e-mails sent by Starbucks related to Armstead's job application.  One line-entry states that an e-mail titled "Starbucks Mutual Arbitration Agreement" was sent by "System" to Ebony Armstead at an aol.com e-mail

address at 9:44 a.m. on May 18, 2015.  (Kennedy Dec. Ex. H.)  Exhibit H also includes a list

headed "Signed Documents," including an entry titled "Arbitration Agreement," which is

denoted as "Signed by Employee" on May 18, 2015 at 9:43 a.m.

3. <u>Starbucks Has Established Armstead's Consent to the Arbitration
Agreement.</u>

The Court concludes that Starbucks has established as a matter of law that

Armstead electronically consented to the arbitration of her claims, and that Armstead has not

come forward with evidence that would permit a reasonable trier of fact to conclude that her

consent was not effective.

The Arbitration Agreement was presented to Armstead as a "clickwrap" or "click-

through" agreement: Armstead was required to take two separate steps of viewing and

electronically signing the Arbitration Agreement.  <u>Meyer</u>, 808 F.3d at 75 ("'clickwrap' (or

'click-through') agreements . . . require users to click an 'I agree' box after being presented with

a list of terms and conditions of use . . . .  Courts routinely uphold clickwrap agreements for the

principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I

agree.'"); <u>see also</u> <u>Moore v. Microsoft Corp.</u>, 293 A.D.2d 587, 587 (2d Dep't 2002) (user agreed

to software license by clicking "I agree" icon prior to download).  The "e-Sign Forms" page was

neatly organized, and the Arbitration Agreement was expressly identified, leaving no room for

doubt as to its contents.  <u>See</u> <u>Mallh v. Showtime Networks Inc.</u>, 2017 WL 5157247 (S.D.N.Y.

Nov. 7, 2017) (weighing absence of "extraneous material" on a web page, clear labeling of terms

of use and "reasonably conspicuous" arbitration clause when concluding that plaintiff had notice

of arbitration provision) (Cote, J.).  The Court concludes that, as a matter of law, Armstead

electronically agreed to be bound by the explicitly identified Arbitration Agreement.

- 10 -

The Court separately concludes that Armstead was, at a minimum, placed on inquiry notice of the Arbitration Agreement, and is therefore bound by its terms.  Armstead's affidavit asserts various explanations as to why she was confused about the contents of the Arbitration Agreement.  She states that the Starbucks manager who assisted her "explicitly told" her that she was merely resubmitting and confirming previously submitted information, and that her electronic signature was being used to confirm the information's truthfulness.  (Armstead Aff't ¶¶ 9-11.)  She states that the manager never mentioned the Arbitration Agreement.  (Armstead Aff't ¶¶ 12-13, 16.)  She correctly notes that the introductory text of the e-Sign Forms page does not expressly mention consent to arbitration, and instead discusses the use of an electronic signature in the context of "information that you provided" on certain forms.  (Armstead Aff't ¶ 16 & Kennedy Dec. Ex. F.)  Armstead asserts that she was "deliberately tricked" into electronically signing the Arbitration Agreement, that she "would never knowingly agree" to it and that Starbucks "deceived" her.  (Armstead Aff't ¶¶ 16-17.)

"Where there is no evidence that the offeree had actual notice of the terms of the agreement, the offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms."  Meyer, 868 F.3d at 74-75; accord Resorb, 30 N.Y.S.3d at 511.  "Whether a reasonably prudent user would be on inquiry notice turns on the clarity and conspicuousness of arbitration terms . . . ."  Meyer, 868 F.3d at 75.  If undisputed facts establish "reasonably conspicuous notice" of the contract terms and "unambiguous manifestation of assent" to those terms, a contract is formed.  Id.  Notice is assessed from the perspective of a "reasonably prudent" person.  Id. at 77-78; Resorb, 30 N.Y.S.3d at 511.  The "transactional context" of communications and "the intention of entering into a forward-looking relationship" are relevant considerations.  Meyer, 868 F.3d at 80.

A reasonably prudent job applicant in Armstead's position would have understood that a document titled "Arbitration Agreement" was, indeed, an agreement to arbitrate certain claims. The document was expressly and conspicuously labeled. It is undisputed that Armstead and other applicants were required to view the Arbitration Agreement prior to electronically signing it. The agreement was presented in the context of a forward-looking employment relationship. Armstead unambiguously consent to the agreement by electronically signing it. Thus, accepting the truth of Armstead's subjective confusion and the statements made by the Starbucks branch manager, the Court concludes that, at a minimum, Armstead was on inquiry notice that she was executing the Arbitration Agreement and consenting to be bound by it.

Lastly, Armstead argues that the Arbitration Agreement is procedurally unconscionable, substantively unconscionable and was executed as a result of fraudulent inducement by Starbucks. "However, it is well accepted under New York law that it is not unconscionable to be bound by an arbitration agreement in the course of securing employment. Moreover, the fact that there is inequality in bargaining power between an employer and a potential employee is not a sufficient reason to hold that arbitration agreements are not enforceable in the employment context." Isaacs v. OCE Bus. Servs., Inc., 968 F. Supp. 2d 564, 570 (S.D.N.Y. 2013) (Koeltl, J.) (internal citations omitted).

The motion to compel arbitration is granted.

B.  The Motion to Stay this Action Is Granted.

The FAA requires courts to stay proceedings when all underlying claims have been referred to arbitration. Katz v. Cellco P'ship, 794 F.3d 341, 345 (2d Cir. 2015). This action is therefore stayed, pending arbitration.

   C.  The Motion to Dismiss Class Action and Collective Action Allegations Is
<u>Denied without Prejudice.</u>

      Starbucks separately moves to dismiss Armstead's allegations purporting to bring claims as a class action under the NYLL and a collective action under the FLSA. Starbucks asserts that because the Arbitration Agreement precludes such claims, this Court does not have subject matter jurisdiction over them.

      No motion for class certification or preliminary certification as a collective action is pending. Armstead is currently pursuing claims only on her own behalf. The Arbitration Agreement's effect is better considered in the context of such certification motions, rather than through the lens of subject matter jurisdiction at the pleading stage. The motion to dismiss pursuant to Rule 12(b)(1) is therefore denied, without prejudice to Starbucks re-asserting its arguments in the event that Armstead brings a certification motion in the future.

CONCLUSION

      Defendant's motion to compel arbitration and to stay this action is GRANTED. (Docket # 27.) Defendant's motion to partially dismiss the Complaint pursuant to Rule 12(b)(1) is DENIED.

      The Clerk is directed to terminate the motion (Docket # 27) and to place this case on the suspense calendar. The parties shall by July 6, 2018 file a written status of the arbitration as of June 29, 2018. If the parties fail to do so, the action will be dismissed.

      SO ORDERED.

                                  P. Kevin Castel
                                United States District Judge

Dated: New York, New York
       November 17, 2017